## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER CARBONE, | : |
| | : CIVIL ACTION |
| *Plaintiff,* | : |
| | : No. 23-5164 |
| v. | : |
| | : JURY TRIAL DEMANDED |
| HOLY FAMILY UNIVERSITY | : |
| | : |
| *Defendant.* | : |

### *AMENDED COMPLAINT*

Plaintiff Christopher Carbone, by and through his attorneys van der Veen, Hartshorn, Levin, and Lindheim, submits this Amended Complaint against Defendant Holy Family University, and in support thereof respectfully alleges as follows:

### NATURE OF THIS ACTION

1. This matter arises from the unfair, prejudiced, and improper conduct on the part of Defendant Holy Family University (hereinafter, "Defendant" or "Holy Family") throughout its sham Title IX investigation and adjudication of allegations lodged both by and against Plaintiff Christopher Carbone (hereinafter, "Plaintiff" or "Dr. Carbone"), stemming from several interactions with student Jane Doe.[1]

2. Dr. Carbone and Ms. Doe each filed a formal complaint against the other regarding events occurring during the Spring 2022 semester and culminating on February 14, 2022. On that date, Ms. Doe attempted to come onto Dr. Carbone, likely acting upon baseless rumors she heard from a friend that Dr. Carbone might be amenable to such a relationship. She showed Dr. Carbone explicit images from her ▮▮▮▮ webpage, and when he indicated he was not interested in her

_____

Throughout this Complaint, Plaintiff will use the pseudonym "Jane Doe" to refer to the individual who filed a Title IX Complaint against him.

romantically, Ms. Doe pouted, telling him she wasn't used to men telling her no. She then tried to kiss him while pretending to throw something into the trash beside his desk. Dr. Carbone ended the interaction and immediately left his office, stunned at what occurred. Ms. Doe proceeded to email Dr. Carbone incessantly over the following weeks attempting to coerce him to agree to meeting in a one-on-one setting, but Dr. Carbone either did not respond or refused to so meet.

3.      After finally accepting that Dr. Carbone rejected her, Ms. Doe concocted a story that she and Dr. Carbone had a consensual sexual relationship and claimed when she tried to end things Dr. Carbone abruptly approached her while she was drawing scientific diagrams on the office whiteboard and digitally penetrated her without consent. She told several versions of this story to different Holy Family professors, who each reported the differing allegations to administration.

4.      Although both parties initiated complaints against the other for violating Holy Family's Title IX Policy, Holy Family predetermined Dr. Carbone to be the guilty party based solely on Ms. Doe's allegations as a female student. Holy Family instructed Dr. Carbone be publicly escorted from campus by security, and before any investigation, issued a Temporary No Contact Order prohibiting him from returning to the school or contacting any faculty or students until the complaint was resolved. By contrast, Holy Family took no action whatsoever against Ms. Doe in response to Dr. Carbone's complaint.

5.      Dr. Carbone served as a well-respected member of the Holy Family faculty prior to Ms. Doe's false accusations. He taught various science courses and also supervised several clubs and extracurricular activities for students. During his nearly eight-year tenure with Holy Family, no other student reported having an inappropriate relationship or contact with Dr. Carbone.

However, after Ms. Doe's allegations spread around campus and rumors ran rampant, several students began second-guessing all of their past interactions with Dr. Carbone and for the first time claimed he made them feel *uncomfortable*.

6.      Holy Family engaged the services of Pietragallo, Gordon, Alfano, Bosick & Raspanti, LLP, specifically Leslie A. Mariotti, Esq. and Angela L. Velez, Esq. (hereinafter, "Investigators"), to conduct an investigation into the parties' respective allegations.

7.      The Investigators conducted a flawed, biased, and deficient investigation into both parties' complaints.   With respect to Ms. Doe's complaint, the Investigators only sought information that might be able to support Ms. Doe's allegations, and which would tend to paint Dr. Carbone in a poor light, regardless of how irrelevant, speculative, or incredible that information may have been.  The Investigators rarely acknowledged or questioned Ms. Doe about the evident (even to a novice investigators' eyes) discrepancies in her story, but when they did, they would either attempt to explain it away or allow Ms. Doe to avoid being pressed about any of these inconsistencies by her crying and her claiming she *felt* invalidated at the hands of the Investigator.

8.      In comparison, the Investigators did not have any interest in corroborating Dr. Carbone's account.  Any information discovered which corroborated or substantiated his version of events Investigators deemed irrelevant, or explained away in some manner which always favored Ms. Doe.

9.      Following the conclusion of a sham "investigation," the Investigators issued a patently biased investigation report detailing their efforts tailored to effectuate a predetermined outcome in favor of Ms. Doe.  The report deemed as irrelevant details of Dr. Carbone's account which were actually corroborated by the investigation.  In contrast, however, investigators included

a multi-page section dedicated to miscellaneous times students heard Dr. Carbone complement a student's outfit or new hair color.

10.     Holy Family also engaged in a pattern of deceptive and duplicitous tactics to ensure that the hearing process resulted in Dr. Carbone's termination, such as changing the rules of evidence applicable to the hearing months into the grievance process, and only providing Dr. Carbone's counsel with the voluminous investigation materials four days before the scheduled hearing.  Ultimately, Holy Family succeeded in its effort to influence the decision maker to find in favor of Ms. Doe and against Dr. Carbone, which allowed for his termination.

11.     Dr. Carbone timely appealed the hearing officer's determination, and in response, Holy Family continued its pattern of attempting to improperly manipulate the outcome.  For example, Holy Family replaced the appeal panel midway through the appeal process claiming that the original appeal panel was no longer available, which undersigned counsel subsequently discovered was false.

12.     Dr. Carbone availed himself of every administrative opportunity available to plead his case and demonstrate his innocence, but Holy Family consistently stacked the cards against him rendering his efforts futile and leaving him with no choice but to file the instant complaint.

13.     Holy Family conducted a flawed, biased, deficient investigation tailored to ensure a predetermined outcome in favor of a female complainant and cross-respondent and against a male respondent and cross-complainant.  By engaging in such gender-based discrimination, Holy Family ensured that Dr. Carbone would be found responsible and unjustly terminated from his employment upending his life.

14.     Dr. Carbone lost his career, his livelihood, and his reputation based upon Holy Family's decision to arbitrarily believe the allegations of a jilted female student before even allowing Dr. Carbone the opportunity to respond.  Out of concern for its image and public opinion, Holy Family acted with conscientious disregard for Dr. Carbone as well as his family when it failed to conduct any meaningful investigation into what actually occurred that night between the two parties.

## PARTIES

15.     Plaintiff Christopher Carbone is an adult resident of Gloucester County, New Jersey.  Prior to his termination, Holy Family employed Plaintiff as a professor.

16.     Defendant Holy Family University is a privately operated educational institution operating a principal place of business in the City and County of Philadelphia, Pennsylvania.

## JURISDICTION

17.     The Court has jurisdiction over this matter, pursuant to 28 U.S.C. §1331, as Plaintiff's cause of action arises under Title IX, 20 U.S.C. §1681, *et seq*.

18.     Jurisdiction lies over state law claims based on the principals of supplemental jurisdiction, as codified at 28 U.S.C. §1367.

## VENUE

19.     All the claims herein arose within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania and involve a Defendant whose principal place of business is within the jurisdictional limits.  Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and (c).

## FACTS

I.    **Dr. Carbone's Background and Relationship with Ms. Doe**

20.    On August 11, 2014, Dr. Carbone began his employment with Defendant Holy Family University as an Assistant Professor.

21.    Dr. Carbone quickly became a beloved professor and Holy Family promoted him to Associate Professor in anticipation of the 2019-2020 school year.

22.    On May 18, 2021, Holy Family awarded Dr. Carbone a multi-year employment contract with the University.

23.    Dr. Carbone taught ███████, ████████ & █████████, █████████████ ██████████████, and ███████.

24.    For the Spring 2022 semester, Jane Doe enrolled in Dr. Carbone's ████████ █████████████ course.  Dr. Carbone had no prior interactions with Ms. Doe.

25.    Dr. Carbone's ████████████████████ course met ████████████████ and ███████ with an additional two-hour lab on ███████████.  In addition to regular class time, Dr. Carbone would hold open study sessions for students seeking additional guidance or tutelage.

26.    The first ████████████████ study session occurred on or about January 31, 2022.  Approximately 6-10 students attended this session, including Jane Doe.

27.    After the study session, Ms. Doe approached Dr. Carbone to discuss the possibility of applying for medical school versus pursuing a career in nursing.  Dr. Carbone was the Chair of the Pre-Med Committee for Holy Family University and, as such, students frequently sought him out when considering a career in medicine.  Ms. Doe also mentioned her mother and boyfriend during this conversation, but exclusively in the context of what roles they would play in her career decisions.

28.     On Friday, February 11, 2022, Ms. Doe requested an individual study session with Dr. Carbone after his evening Habitat for Humanity meeting concluded.  This meeting was largely uneventful; however, Ms. Doe brought Dr. Carbone a plastic periodic table as a gift.

29.     Ms. Doe subsequently requested another one-on-one study session on February 14, 2022.  Shortly after entering Dr. Carbone's office, Ms. Doe began talking about what she had done the previous Friday night after leaving their study session.

30.     Ms. Doe told Dr. Carbone that she and a friend went to a local bar where several men expressed interest in her and purchased her drinks.  Ms. Doe then heavily implied that she was interested in a physical relationship with Dr. Carbone.

31.     Dr. Carbone rebuffed Ms. Doe's advances, but she was undeterred.  Ms. Doe then took out her phone and began showing Dr. Carbone sexually explicit photos from her ▮▮▮▮ page.  She told Dr. Carbone that she would be willing to let Dr. Carbone subscribe to her ▮▮▮▮ page, telling him that he should not feel uncomfortable because another Holy Family professor, ▮▮▮▮, also follows her on ▮▮▮▮s.

32.     Dr. Carbone unequivocally told Ms. Doe "No" and insisted that the conversation return to academics.  At that time, Dr. Carbone sat behind his desk and Ms. Doe sat in one of the seats located in front of his desk.

33.     Ms. Doe initially indicated that she would return the topic of conversation to academics, but quickly changed her mind.  She took a piece of paper from her academic planner, crumpled it up, and went to throw it out in the trashcan located under Dr. Carbone's desk.

34.     Dr. Carbone initially thought nothing of this action, but shortly thereafter realized

Ms. Doe's ulterior motives when she went to kiss him while straightening up from throwing out the paper. Again, Dr. Carbone immediately rebuked her advances and insisted her conduct was inappropriate.

35. Ms. Doe returned to her seat across from Dr. Carbone, but she refused to give up. She then pulled down her lowcut shirt to expose her breast and nipple ring, asking Dr. Carbone if he liked what he saw.

36. In response, Dr. Carbone immediately collected his things to take home from work, and told Ms. Doe she had to leave, swiftly exiting his office himself. Ms. Doe followed Dr. Carbone out and down to the parking lot, continuing in her attempts to seduce him suggesting they get a hotel room. Realizing the persistent nature of Ms. Doe's attempts, Dr. Carbone made sure the two were directly in line with the surveillance cameras located outside of the nursing building, told Ms. Doe "No" one more time, and the two parted ways.

37. Shortly after returning home, Ms. Doe sent Dr. Carbone the following email message:

> Thanks so much for helping ! I'm working on my work schedule to try to stay earlier . I appreciate you accommodating to help during the labs and regular chapters ! We can plan something to meet before the exam . I want to show you my study guide outline when I'm done with this. Just let me know days that work for you and I'll check with work and school!
>
> Jane!

38. Dr. Carbone told his wife the following morning everything that occurred.

39. Over the next several weeks, Ms. Doe attempted numerous times to set up another one-on-one session with Dr. Carbone; however, he adamantly refused or ignored Ms. Doe's requests.

40.     On March 7, 2022, after returning from spring break, Ms. Doe approached Dr. Carbone after he did not say hello to her when she entered the classroom.  She asked him why he was ignoring her and what was wrong.

41.     At some point in mid-March 2022, Dr. Carbone realized that Ms. Doe missed three consecutive classes and grew concerned for her welfare.  He sent an email to Ms. Doe inquiring about her absences and making sure that she was alright.  Dr. Carbone also asked another student who he knew to be friends with Ms. Doe whether she was alright.

42.     Dr. Carbone would later discover that Ms. Doe had been transferred out of his class due to the allegations of sexual misconduct she had made against him.

43.     Ms. Doe alleged that she and Dr. Carbone had been engaged in a physical relationship since the beginning of the semester.

44.     Dr. Carbone initially learned that Ms. Doe filed a Title IX complaint against him when security escorted him off of campus on March 16, 2023, only two days after she filed her complaint.

45.     He would later learn that Ms. Doe reported his email asking if she was alright following her series of absences to Dean Marianne Price, as if Dr. Carbone had been the one harassing Ms. Doe, which prompted the subsequent removal.

46.     Holy Family not only severely embarrassed Dr. Carbone by publicly escorting him off of campus, but they also issued a Temporary No Contact Order restricting Dr. Carbone's ability to communicate with Holy Family employees and students.

47.     Shortly thereafter, Holy Family retained the services of the Investigators to conduct the investigation into Ms. Doe's allegations.

## II.     Holy Family's Title IX Investigation

48.     On March 24, 2022, the Investigators began their investigation by interviewing Ms. Doe.  Ms. Doe described a consensual kissing relationship with Dr. Carbone premised on a promise that she would make Dean's List.  Ms. Doe alleged that Dr. Carbone wanted to engage in further sexual acts, but she refused.

49.     Ms. Doe stated that this consensual relationship continued until February 14, 2022, when she decided to break things off after a group study session.  She allegedly told Dr. Carbone that she believed this relationship wasn't worth it because he was getting paranoid about someone discovering their relationship.  She further described Dr. Carbone's reaction as upset but accepting of the situation.

50.     Ms. Doe claimed that the two simply continued to study Anatomy following this "break up" of sorts.  About twenty minutes later, Ms. Doe stated that she was writing on the whiteboard when Dr. Carbone spun her around and shoved his hand down her pants, digitally penetrating her vagina.  She subsequently packed her belongings and left.

51.     Ms. Doe did not put forth this version of events for several weeks following the alleged assault.

52.     During her interview, Ms. Doe also told Investigators that prior to the Spring Semester when she took Dr. Carbone's ███████ course, her friend Nina Danko informed her that Dr. Carbone slept with students.

53.     Investigators subsequently interviewed ███████, who explained that she only heard rumors regarding Dr. Carbone and did not have any actual knowledge of inappropriate behavior.

54.     Ms. ███ also recalled several instances in which she felt Dr. Carbone's behavior was "weird," such as complimenting a student's choice of eyeshadow, and at least one interaction in which nothing happened, but she felt "very weird." Ms. ███ never reported either of these incidents prior to Ms. Doe's allegations.

55.     Investigators interviewed numerous other students named by Ms. Doe as potential witnesses, but none of these students provided any useful information or evidence. Several students merely described getting a weird vibe from Dr. Carbone, which of course they only voiced after the allegations against him went public branding him.

56.     Investigators also interviewed the staff members to whom Ms. Doe reported her allegations against Dr. Carbone: (1) Dr. Edward Waddell, her Anatomy I professor from the previous semester; (2) Dr. ███ her Intro to ███ professor; (3) Dr. Gina MacKenzie, acting Dean of the School of Arts and Sciences; and (4) ███, her advisor for the student newspaper. These disclosures took place between March 10th and March 18th, 2022.

57.     Ms. Doe offered varying stories to each Holy Family staff member to whom she reported. She told some professors about a consensual relationship, while omitting this information from others. She also told at least one staff member about an entirely fictitious interaction between herself, Dr. Carbone, and Dr. MacKenzie, and claimed that Dr. Carbone had been emailing her, harassing her, and telling her not to tell anyone, which is demonstrably false.

58.     On April 27, 2022, Investigators interviewed Dr. Carbone for the first time.

59.     Dr. Carbone recounted that Ms. Doe would regularly come to his ███ I study sessions and request to stay after for individual tutoring. He would engage in discussions regarding her career path and how her family would fit into these plans, but he stated that these conversations never crossed a line.

60.     He further stated that it was Ms. Doe who continuously attempted to push the boundaries of their student-teacher relationship, ultimately leading to the events of February 14, 2022.  She would bring him gifts and tell him about men that expressed interest in her.

61.     On February 14, 2022, Ms. Doe approached Dr. Carbone in his office following a study session intent on seducing him, even exposing her breast in furtherance of this pursuit.

62.     When Dr. Carbone rebuked her advances, Ms. Doe remained steadfast and attempted to convince Dr. Carbone to subscribe to her ███████ page where she would post provocative and sexually explicit images of herself.  She even showed Dr. Carbone a photo she took for her page in which she wore a schoolgirl outfit and held a Biology textbook.

63.     Ms. Doe told Dr. Carbone that another Holy Family professor, ███████████, subscribed to her ██████████ page.

64.     Following the events of February 14, 2022, Dr. Carbone attempted to limit his contact with Ms. Doe and would not allow himself to be alone with her always instead seeking to have other people around.

65.     Dr. Carbone also told investigators that he disclosed what happened to his wife the following morning, which was the earliest opportunity he has without awakening his wife when I came home the previous evening.  Dr. Carbone's wife would later verify this information to investigators including the information concerning the nipple ring.

66.     Dr. Carbone also discussed his limited disciplinary history at Holy Family.  He recalled receiving a write-up for staying late with students for a study session during finals week. He also recalled having been written up for staying in a building after hours with a student who was studying for the MCATs; he further noted that the student's mother was present in the building the entire time.

67.     Shortly after his interview, on May 3, 2022, Dr. Carbone filed a cross-complaint against Ms. Doe for her inappropriate actions toward him.  Dr. Carbone initially chose not to report Ms. Doe's inappropriate conduct out of concern for her future; however, he realized that he had no choice but to address what occurred.

68.     On May 11, 2022, Investigators interviewed Dr. ███████, the Holy Family professor Ms. Doe told Dr. Carbone subscribed to her ██████ page.

69.     While he denied subscribing, Dr. ████ admitted that Ms. Doe told him that she had an █████ page, and that the two follow each other on Twitter.  He further explained that Ms. Doe broached the topic of her ██████ page while in his office discussing politics, her struggles with ████ and her relationship with her boyfriend.

70.     Investigators subsequently interviewed Ms. Doe for a second time, asking about her relationship with Dr. ████.  She admitted that Dr. ████ is the only professor who follows her on social media but contradicted him by claiming that she never told him about her ██████ page.

71.     Ms. Doe also disclosed that she has a picture on her ██████ page matching the sexy schoolgirl holding a biology textbook photo Dr. Carbone told investigators she showed him from ███████  She also confirmed that he is not a subscriber when prompted by investigators. Moreover, she admitted that Dr. Carbone would not have been able to locate her ██████ page without her phone number or personal email, neither of which Dr. Carbone possessed.

72.     Investigators also asked Ms. Doe about the many emails she sent to Dr. Carbone both before and after the alleged assault in which she requests an individual study session.  Ms. Doe grew defensive and provided several implausible answers for why she continued to actively seek out Dr. Carbone for an individual study session following the events of February 14, 2022, but conceded that Dr. Carbone did not grant her many requests.

### III.    **Holy Family Changes Title IX Policy during Investigation**

73.     On July 6, 2022, after all relevant interviews had been conducted, Holy Family revised its Title IX Policy to allow for the introduction of witness statements at a hearing regardless of whether that party is subject to cross-examination.  This was not permitted under the previous policy in effect at the time of the alleged assault, and the revisions came at a time when Holy Family knew Dr. Carbone had engaged counsel, and the change itself violated existing Title IX regulations.

74.     Holy Family justified this decision by citing to a District Court of Massachusetts decision and a subsequent Letter from the Department of Education ("DOE"), which had been issued nearly a year before Holy Family felt the spontaneous need to change its policy.

75.     Both the District Court of Massachusetts decision and the DOE letter addressed a very specific loophole created by the then-regulations.  As worded, Title IX *respondents* would be able to exclude their previous statements and communications by declining to testify, as the language did not include any opposing party statement exception.

76.     Holy Family's Policy in effect prior to the change did not include a similar loophole to the one addressed in the District Court of Massachusetts decision and the DOE letter as it clearly stated that witness, not party, statements would be excluded if the declarant did not testify.  Plaintiff believes and therefore avers Holy Family changed its policy in order to use hearsay testimony to punish Dr. Carbone when it became evident to Investigators that their witnesses' credibility could not withstand cross-examination.

IV.     **Conclusion of Investigation and Report**

77.     Despite completing their final interview nearly two months earlier, the Investigators did not complete their investigation and issue an initial Investigation Report for the parties' review until September 6, 2022.

78.     The Investigation Report displayed clear bias toward Ms. Doe, who not only was a complainant, but also a cross-respondent.  For example, Investigators determined that whether Ms. Doe engaged in a prior relationship with Dr. ███████ or whether he knew about her ███████s account was not relevant, despite the fact that it would lend substantial credibility to Dr. Carbone's version of events.

79.     By contrast, the Investigators deemed relevant several times Dr. Carbone complimented a student's hair or clothing as well as the fact that several students described getting a "weird" feeling from Dr. Carbone.  The Investigation Report neglects to mention that there are no reports of Dr. Carbone making students feel "uncomfortable" or giving them a "weird" feeling prior to these allegations becoming public.

80.     Oddly, it was the Investigators' ordinary and routine practice authorized by Holy Family to not record interviews (neither audio nor video) and instead draft witness statement summaries.  As such, there is no objective record of witness statements and no concrete way to know what each individual may or may not have said. Everything that went on paper was filtered through the biased eyes of the Investigators.

81.     Dr. Carbone, through counsel, voiced these concerns as well as numerous others to the Investigators within the time period allotted for comment before finalization.  However, the Investigators merely added footnotes to the Final Investigation Report stating Dr. Carbone's objections and summarily dismissing them.

82.     Up until this point, the Investigators failed to provide Dr. Carbone with any materials collected throughout the investigation (e.g., interviews, emails, etc.) other than the notes from his own interview as well as the interview of his wife.  Holy Family sent Dr. Carbone as well as his advisor a Share Drive file labeled "Evidence"; however, neither he nor his advisor could open the file.  He brought this concern to the attention of Dean Marianne Price as well as the Investigators, but the problem was never resolved, and Dr. Carbone and his defense team never did gain access the Share Point file, even until present day.

83.     Upon information and belief, Ms. Doe and her advisor experienced no similar difficulties accessing the Evidence folder.

**V.     Title IX Hearing**

84.     A hearing regarding both Ms. Doe's Title IX Complaint as well as Dr. Carbone's Title IX Complaint was scheduled to move forward on December 2, 2022.

85.     On November 16, 2022, Dean Price emailed Dr. Carbone's counsel stating that Holy Family would provide Dr. Carbone's counsel with a single hard copy of the evidence and Final Investigation Report under the condition that Dr. Carbone sign an acknowledgment that these documents cannot be copied and must be destroyed within 24-hours after the conclusion of the hearing.

86.     Dr. Carbone, through counsel, provided this signed acknowledgment to Dean Price two days later on November 18, 2022.  Dean Price failed to respond until November 28, 2022, four (4) days before the scheduled hearing, informing the undersigned that a hard copy of the documents would be available for pickup.

87.     Counsel retrieved the hard copy documents from Holy Family only to find hundreds and hundreds of pages that counsel had never seen before.  Nonetheless, counsel persevered and

spent the entirety of the next several days and nights reviewing this material in order to prepare for the conference.

88.     On December 2, 2022, Ret. Judge Jane Cutler Greenspan presided over Dr. Carbone's hearing.  Dr. Carbone presented his own testimony and also called Dr. ███████ Ms. Doe presented only her own testimony.  Ms. Velez testified on behalf of the investigation team.

89.     Judge Greenspan issued her decision on December 20, 2022, finding for Ms. Doe and demonstrating clear bias in her favor as a female complainant and cross-respondent, and against Dr. Carbone, a male respondent and cross-complainant.

90.     For example, Judge Greenspan credited Ms. Doe's account since it involved some admission of wrongdoing (i.e., the consensual relationship for good grades), which gave it a "ring of truth."

91.     By contrast, Judge Greenspan *dis*credited Dr. Carbone's account based upon the fact that he called Dr. ██████ to testify about his knowledge of Ms. Doe's ██████ page, which in reality strongly corroborated Dr. Carbone's account.

92.     Judge Greenspan also inexplicably accepted Ms. Doe's contention that she kept persistently emailing Dr. Carbone to set up an individual study session in order to "normalize" the relationship.

93.     Again, in stark comparison, Judge Greenspan leapt to the conclusion that the only reason Dr. Carbone did not answer Ms. Doe's numerous emails requesting an individual study session was to corroborate his story of harassment to his wife.

94.     Finally, Judge Greenspan considered in her decision numerous statements of witnesses who did not testify or subject themselves to cross-examination, in violation of the policy in place at the time both complaints were filed.

## VI.   __Appeal of the Title IX Decision__

95.     Dr. Carbone, through counsel, filed a timely appeal request within seven (7) days of receiving Judge Greenspan's decision.

96.     On January 11, 2023, Dr. Carbone received a Notice of Designation of Appeal Panel designating Montgomery, McCracken, Walker & Rhoads LLP ("MMWR") to handle the appeal.  The Notice further directed that additional materials may be submitted directly to the panel.

97.     Dr. Carbone complied with the Notice requirements and submitted a brief in support of his appeal to Holy Family and the Appeal Panel on January 27, 2023.

98.     Four days later after laying out his arguments on appeal, on January 31, 2023, Dr. Carbone and his advisor received notice from Holy Family replacing the previously appointed panel to whom Dr. Carbone had submitted his brief with a different firm, Bernstein, Shur, Sawyer & Nelson, P.A. ("Bernstein Shur"), to handle the appeal.  Notably, Bernstein Shur only has offices located in Maine and New Hampshire.  It is beyond reckoning how this firm came to be selected to replace a local high profile firm while ignoring the numerous firms experienced in handling these matters in the Philadelphia area.

99.     Dr. Carbone's advisor personally called the Appeal Chair at MMWR to inquire further and learned that Holy Family unilaterally and unexpectedly removed the firm from the appeal without any justification, contrary to Holy Family's assertions that MMWR backed out of the arrangement.

100.    The Bernstein Shur Appeal Panel subsequently issued a generic denial of Dr. Carbone's appeal.

101.    Shortly thereafter, Dr. Carbone received a letter from Holy Family University President, Dr. Anne Prisco, indicating that he would be afforded the opportunity to meet with her to discuss his termination before the decision was finalized if he so requested.

102.    While recognizing that this was a mere formality required by the applicable policies, Dr. Carbone did not want to allow any opportunity to clear his name to pass by and contacted his attorneys to attend this meeting with him.

103.    Dr. Carbone's counsel emailed Dr. Prisco respectfully requesting the offered meeting and informed Dr. Prisco that counsel intended to be present for said meeting.

104.    Dr. Prisco categorically refused to meet with Dr. Carbone while in the presence of counsel.

105.    On April 13, 2023, Dr. Prisco sent Dr. Carbone a formal termination letter, indicating that he "declined" the opportunity to meet with her, ignoring the fact that she would not meet with Dr. Carbone unless he appeared without counsel.

**VII.    Holy Family's Breach of Agreement and Contract with Dr. Carbone**

106.    Holy Family's Sexual Harassment & Nondiscrimination Policy mutually bound both Dr. Carbone, Holy Family, and its agents and representatives.

107.    Holy Family continuously breached this agreement throughout the Title IX Grievance Process.

108.    Pursuant to Holy Family's Policy, the Title IX Grievance Process "will be concluded within a reasonably prompt manner, and no longer than ninety (90) calendar[1] days after the filing of the Formal Complaint[.]"  The Policy further provides that the process may be delayed

---

[1] Confusingly, at other points in the Policy, this time frame is referenced as ninety (90) *business* days.

for good cause shown, but Holy Family "will provide written notice to the parties of the delay, the cause of the delay, and an estimate of the anticipated additional time that will be needed as a result of the delay."

    a.   Holy Family failed to resolve Dr. Carbone's complaint until two hundred and thirty seven (237) days after he filed and failed to resolve Ms. Doe's complaint against Dr. Carbone until two hundred and eighty one (281) days.

    b.   Dr. Carbone never received any notice from Holy Family alerting him of a delay, the cause of the delay, or the new estimated resolution time frame.

109.    Holy Family's Policy further states that respondents are entitled to a presumption of innocence unless it is established by a preponderance of the evidence that the respondent engaged in the complained of prohibited conduct. It also requires all parties to have a full and fair opportunity to fully review and respond to all evidence on the record.

    a.   The Investigators, acting as agents of Holy Family, conducted their investigation through a lens of gender-based bias and discrimination, attempting to achieve a certain result in favor of the female complainant.

    b.   Moreover, Holy Family's own actions created a situation where it could not exonerate Dr. Carbone and have him return to campus without facing public backlash. Holy Family publicly escorted Dr. Carbone off campus in front of students and faculty, signifying his guilt. Ms. Doe subsequently told numerous staff members and students her account of what occurred, while Dr. Carbone was prohibited from so much as contacting anyone associated

with Holy Family by the Temporary No Contact Order.  As such, Ms. Doe's account spread throughout the Holy Family community, seemingly confirmed by Holy Family's public and humiliating removal of Dr. Carbone from campus.

110.    Holy Family's Policy states that all parties will be afforded a full and fair opportunity to fully review and respond to all the evidence on the record.  Holy Family denied Dr. Carbone this opportunity by only providing him with a copy of the voluminous evidentiary materials days before the hearing, literally requiring his counsel to work day and night to prepare, resulting in substantial prejudice.

**COUNT ONE**
**TITLE IX VIOLATION**
**ERRONEOUS OUTCOME**

111.    Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

112.    Title IX of the Educational Amendments of 1973 ("Title IX") provides that "[n]o person…shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. §1681(a).  Title IX also provides for a private cause of action.

113.    Upon information and belief, Holy Family receives federal funding subjecting it to the requirements of Title IX.

114.    To establish an erroneous outcome claim under Title IX, a plaintiff must establish that a procedurally or otherwise flawed proceeding led to an erroneous outcome where gender acted as a motivating factor for said erroneous outcome.

115.    Dr. Carbone never assaulted nor engaged in any consensual (or non-consensual) sexual act with Ms. Doe, despite her representations otherwise.  Ms. Doe instead engaged in sexually inappropriate behavior toward Dr. Carbone, which he rebuked.  As such, Holy Family produced an erroneous outcome through its Grievance Process when it determined Dr. Carbone to be in violation of its policies, but exonerating Ms. Doe.

116.    Dr. Carbone (male) and Ms. Doe (female) each filed a Title IX Complaint against the other arising from the events of February 14, 2022.

117.    Holy Family, as well as the Investigators it selected, bore a responsibility to treat these complaints equally; however, that there is strong evidence that did not occur.

118.    When Ms. Doe filed her complaint against Dr. Carbone, Holy Family almost immediately issued a Temporary No Contact Order and publicly humiliated Dr. Carbone by having security escort him off campus.  Absolutely no action was taken against Ms. Doe when Dr. Carbone filed his complaint including allowing Ms. Doe to say whatever she wished to poison the entire student body against Dr. Carbone building on the predetermined negative outcome guaranteed by Holy Family's gender-biased-from-the-start treatment of Dr. Carbone.

119.    Holy Family allowed Ms. Doe to have complete control over the narrative spread throughout campus, as Dr. Carbone was prohibited from communicating with any staff or student associated with Holy Family.  Further, Holy Family's public removal of Dr. Carbone placed a metaphorical Scarlett Letter on his back seemingly corroborating Ms. Doe's account to the average member of campus.

120.    Review of the investigation materials also reveals that the Investigators intently sought out any triviality to create the appearance of putting Dr. Carbone in a bad light, regardless its relevance, credibility, or speculative nature, while simultaneously seeking to discredit any

evidence corroborating Dr. Carbone's account. Investigators significantly and unnecessarily extended the investigation timeline without just cause in order to continue turning over every rock in the hope of corroborating Ms. Doe's story.

121. Nothing illustrates the biased nature of the investigation more than Dr. ████'s interview. Dr. Carbone provided the Investigators with the name of a specific professor. Dr. ████ had no relationship with Dr. Carbone. Ms. Doe told Dr. Carbone that Dr. ████ subscribed to her ████ page. Dr. ████ *admitted* that Ms. Doe told him about her ████ account, even if he denies actually subscribing, and Ms. Doe lied to the Investigators that she had *never* mentioned her sexually oriented ████ page to *any* Holy Family professors. Not only did Investigators fail to give afford this specific, corroborating fact the weight appropriate weight, but they actually declared it to be *irrelevant*.

122. By contrast, Investigators determined that it was of particular relevance that a few Holy Family students reported (after the allegations went public) that Dr. Carbone gave them a "weird feeling." Investigators failed to account for the immense bias and shadow cast over Dr. Carbone and his reputation after Ms. Doe's allegations began to spread around campus. Students began to question every innocuous interaction they ever had with Dr. Carbone operating under the newfound conclusion that he is a convicted predator, making every time he complimented a student's hair or clothing seem like something other than the innocent statement it was. To these Investigators "feelings" are relevant, even determinative, evidence.

123. Judge Greenspan's decision also acts as a perfect example of the double standard applied to the parties' complaints. Ms. Doe admitted wrongdoing and it somehow made her more credible; however, regardless of whose account Judge Greenspan believed, Dr. Carbone indisputably did the correct thing by not answering Ms. Doe's persistent emails requesting an

individual study session after February 14, 2022, yet somehow doing the right thing *still* supported a finding of guilt as Judge Greenspan found Dr. Carbone only did so to support his story to his wife. This, instead of evidence of a young woman doing everything she could to seduce her professor to improve her grades who failed, felt foolish and spurned and decided to use the Title IX provisions to exact her revenge.  No other male professor would ever dare spurn her again after what she accomplished against Dr. Carbone.

124.    Judge Greenspan also failed to take into consideration the considerable evidence supporting Dr. Carbone's account and refuting Ms. Doe's story.  First, Ms. Doe claimed that the two engaged in a consensual relationship for several weeks before the assault, yet she admitted that the pair never communicated through the phone and did not even exchange cell phone numbers.  Instead, Ms. Doe claimed that Dr. Carbone told her to keep everything "email code."  It is entirely implausible to believe that Dr. Carbone would suggest the two of them having this forbidden affair should communicate exclusively through the school email server.

125.    Ms. Doe's explanation for her numerous emails requesting to meet individually with Dr. Carbone following her alleged assault is similarly implausible.  Ms. Doe may have maintained niceties with Dr. Carbone in order to reestablish a sense of normalcy or even continued to ask questions via email, but there is no credible reason why Ms. Doe would persistently continue to attempt to meet with Dr. Carbone in an individual one-on-one setting.  She further damaged her credibility by claiming to be frightened of Dr. Carbone and the possibility of seeing him, while still actively trying to set up a one-on-one meeting with him mere days before she claimed the alleged assault.

126.    Holy Family artificially manipulated the investigation into Dr. Carbone and Ms.

Doe's complaints to avoid the negative publicity it may receive for "discrediting" the allegations of a female student who claimed to be abused by a male in a position of authority.

127.    Based on the foregoing, Holy Family subjected Plaintiff to a biased, prejudiced, and unfair process in violation of Title IX.

128.    Holy Family's unlawful discrimination in violation of Title IX caused Plaintiff to incur substantial damages including, but not limited to, lost wages, loss of benefits and seniority, and reputational damage, humiliation, and mental anguish.

## COUNT TWO
## TITLE IX VIOLATION
## SELECTIVE ENFORCEMENT

129.    Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

130.    To succeed in a selective enforcement claim under Title IX, a plaintiff must show that a female in substantially similar circumstances to his own was treated more favorably by the educational institution.

131.    Holy Family engaged in a pattern of selective enforcement by immediately crediting the account of a female student, Ms. Doe, and immediately discrediting the account of a male faculty member, Dr. Carbone.

132.    Holy Family's decision to have Dr. Carbone publicly removed from campus and forbid him from speaking to any Holy Family students of staff without affording him the opportunity to even explain himself. Holy Family did so after Dr. Carbone sent Ms. Doe an innocuous email asking whether she was okay after she missed several classes, completely unaware at that time that she filed a complaint.

133.   Holy Family's rash and inappropriate rush to judgement not only demonstrates Holy Family's blind willingness to believe a female complaint over a male respondent, but also created a situation where Dr. Carbone could never return to campus without being followed by the stigma of what occurred.

134.   Based on the foregoing, Holy Faily subjected Plaintiff to a biased, prejudiced, and unfair process in violation of Title IX.

135.   Holy Family's unlawful discrimination in violation of Title IX caused Plaintiff to incur substantial damages including, but not limited to, lost wages, loss of benefits and seniority, reputational damage, humiliation, and mental anguish.

**COUNT THREE**
**BREACH OF CONTRACT**

136.   Plaintiff incorporates the preceding paragraphs of this Complaint as if same were set forth herein at length.

137.   Upon accepting employment with Holy Family, Dr. Carbone entered into a contract with Holy Family comprised of the policies and procedures promulgated by the University.

138.   Holy Family's policies provided that certain impartiality and fairness would be afforded throughout the Title IX Grievance Process.

139.   Holy Family breached each of these promises that are embodied in its own policies and procedures.

140.   As a result of this breach, Dr. Carbone has suffered harm in the form of lost income, reputational damages, humiliation, and mental anguish.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against Defendant as follows:

1.      That this Court find that Defendant committed acts and omissions violating Title IX of the Educational Amendments of 1972;

2.      As to Count I, a judgment against Defendant for compensatory damages in excess of $150,000.00, together with reasonable costs and prejudgment interest;

3.      As to Count II, a judgment against Defendant for compensatory damages in excess of $150,000.00, together with reasonable costs and prejudgment interest;

4.      As to Count III, a judgment against Defendant for compensatory damages in excess of $150,000.00, together with reasonable costs and prejudgment interest;  5. For such other relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully Submitted,

Date: April 24, 2024          By:      _Bruce L. Castor, Jr._
                                       Bruce L. Castor, Jr. I.D.
                                       No. 46370
                                       Kaitlin C. McCaffrey
                                       I.D. No. 329960
                                       Attorneys for Plaintiffs
                                       1219 Spruce Street
                                       Philadelphia, PA 19107
                                       P: (215) 546-1000
                                       F: (215) 546-8529
                                       E: bcastor@mtvlaw.com